**EXHIBIT E**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

THOMAS POST, Individually and as
Personal Representative of the
Estate of Ida Post; DEBRA
FERGUSON; BOBBIE HASKETT;
MICHAEL POST; LAURA ZEDAKER and
MARGIE ZERVOS,

        Plaintiffs,

Vs.        Case No. 2:11-CV-00792-JAM-CMK

SUNBEAM PRODUCTS, INC.,

        Defendant.
_____/



COPY

--oOo--
WEDNESDAY, MARCH 14, 2012
--oOo--
DEPOSITION OF
LOREN G. LIPSON, M.D.
--oOo--

Ref. No. 11096
Reported By:  CAROL S. NYGARD
               California CSR No. 4018
               Nevada CCR No. 915
               Registered Merit Reporter

**CAROL NYGARD & ASSOCIATES**

DEPOSITION REPORTERS

**Sacramento**
2295 Gateway Oaks Dr., Suite 170
Sacramento, CA 95833

**San Francisco**
225 Bush Street, Suite 1830
San Francisco, CA 94104






NNRC MEMBER
NATIONAL NETWORK OF
REPORTING COMPANIES

www.SacramentoCourtReporter.com        www.SanFranciscoCourtReporter.com

Carol Nygard & Associates - (877) 438-7787    1

1        APPEARANCES:

2    For the Plaintiffs:

3    MARY ALEXANDER & ASSOCIATES, P.C.
     BY:  MARY E. ALEXANDER, Attorney at Law
4    44 Montgomery Street, Suite 1303
     San Francisco, California  94104
5    415.433.4440
     malexander@maryalexanderlaw.com
6


7    The Defendant:

8    BOLLING & GAWTHROP
     BY:  JOHN P. COLEMAN, Attorney at Law
9    8880 Cal Center Drive, Suite 190
     Sacramento, California  95826
10   916.969.0777
     jpc@bwg-inc.com
11
                    --o0o--
12

I, CAROL S. NYGARD, a Certified Shorthand

2  Reporter of the State of California, duly authorized to

3  administer oaths, do hereby certify:

4    That the foregoing proceedings were taken

5  before me at the time and place herein set forth; that

6  any witnesses in the foregoing proceedings, prior to

7  testifying, were duly sworn; that a record of the

8  proceedings was made by me using machine shorthand which

9  was thereafter transcribed under my direction; that the

10 foregoing transcript is a true record of the testimony

11 given.

12    Further, that if the foregoing pertains to the

13 original transcript of a deposition in a Federal Case,

14 before completion of the proceedings review of the

15 transcript [ ] was [X] was not requested.

16    I further certify I am neither financially

17 interested in the action nor a relative or employee of

18 any attorney or party to this action.

19    IN WITNESS WHEREOF, I have this date

20 subscribed my name:

21    Dated:    MARCH 15, 2012

22

23    _____

24           CAROL S. NYGARD CSR #4018

25

1  A.   Sure.
2  Q.   But we, obviously, have no evidence that
3  there's any cyanide --
4  A.   Oh, we have.
5  Q.   -- in her system?
6  A.   Oh, well, because it wasn't measured, but
7  that's --
8       You know, she died of the fire in my opinion,
9  and she died of the consequences of the fire, and there
10 are many things that led to this unexpected and untimely
11 demise, and that's what we're going to be doing today,
12 is going in to some of those aspects.
13 Q.   So, if you assume she died because of the
14 fire, then you think this could have been a possibility
15 of a cause of her death?
16 A.   In part, yes.
17 Q.   Okay.  In point of fact there's no evidence
18 that she inhaled any fumes from cotton, nylon, rayon
19 burning; is that correct?
20 A.   What do you mean by "no evidence"?
21      There was not a test done, but that doesn't
22 mean she didn't, and as long as she was breathing, which
23 in all reasonable medical probability she was, she
24 inhaled these in addition to getting burns.
25 Q.   Right.

1 by the County to investigate this case -- is that
2 correct?
3         Is that your understanding?
4   A.    That's my understanding, Butte County.
5   Q.    He was the pathologist, a private pathologist
6 that the coroner used to investigate, I guess, is
7 technically correct?
8   A.    Correct.
9   Q.    Did he find any evidence of toxic gases in Ida
10 Post?
11   A.    He didn't check, as far as I know, for any.
12         I mean, his role was different from probably
13 what is being asked of him in his deposition.
14         His role was to see if this was an accident
15 versus a homicide.
16         And so basically what we have is he evaluated
17 the case, talked with Fire, and basically from his
18 findings they were consistent with his discussions with
19 the Fire people, and he did tests that in his mind were
20 appropriate.
21   Q.    What specific facts are you aware of from your
22 investigation in this case that support your opinion
23 that she was breathing at the time the fire started?
24   A.    Number one, she had been talking just prior to
25 the fire starting to the family.

1       (Discussion off the record)
2  BY MR. COLEMAN:
3       Q.   Take a look at Exhibit 4, and this is the
4  fourth article, and it's captioned "Carbon Monoxide &
5  Hydrogen Cyanide Make Today's Fires More Dangerous."
6       A.   Yes.
7            And, again, this is just something that has
8  come out on Valentine's Day of this year.
9            This was done by a fireman looking at the area
10 and letting people be aware of the area -- of the fact
11 that it's not just the fire itself, it's the other
12 things around one, and talking about how firefighters
13 are dying because of untold contaminations that they're
14 going through, again, similar to things that happened to
15 Ms. Post.
16      Q.   Do you hold yourself out as an expert in
17 determining what gases may have killed her?
18      A.   Oh, no, I'm not, but I -- I can read, and I'm
19 a physician, and I've dealt with people dying from all
20 different things.
21           I've been involved with multiple different
22 departments in the medical school and with multiple
23 practitioners, and to me the fact that the numbers of
24 things that were noted by Captain Rapp and Mr. Collins
25 burning are consistent with the findings here, and this

```
1  was brought forth by statements made by Dr. Reck --
2           Let's see.
3           MS. ALEXANDER:  Resk.
4           THE WITNESS:  Resk.  Sorry.
5           And also Thomas Bennett, who alerted me to
6  this.
7  BY MR. COLEMAN:
8     Q.   Are you aware of any testing that is planned
9  to be done with respect to determining what gases may
10 have been present as a result of a fire on a couch with
11 the electric blanket?
12    A.   I don't understand the question.
13    Q.   Do you plan to do any testing to determine
14 what sort of gases may be released?
15    A.   They don't let me near matches.
16    Q.   Okay.  Do you have any opinion as to the time
17 frame it would take for someone who is breathing when a
18 fire starts such as this fire on a couch?
19    A.   Time frame of what?
20    Q.   Before death, before you stop breathing.
21    A.   Depends what the toxic load is and depends if
22 you're not getting oxygen you're supposed to be getting,
23 and it depends on the amount of pain you're in and the
24 stress from being burned also.
25    Q.   Okay.  Is it fair to say you could not make
```

```
 1  right.
 2  BY MR. COLEMAN:
 3      Q.   Right.
 4           Have any of those opinions changed with your
 5  further review of the materials?
 6      A.   Well, let's just read them, and then I'll
 7  answer that.
 8           "Ms. Post died prematurely and unexpectedly as
 9  a result of a fire in her home on November 26th, 2009,
10  which was Thanksgiving Day."
11           And I'll just say in all reasonable medical
12  probability -- and just further, that the -- her ---
13  that toxic gases played a substantial role as well as
14  the burning itself in her death.
15           Okay.  Number two, "Ms. Post's death was
16  frightening, painful and horrific.  She could not on her
17  own move out of harm's way."
18           In my opinion over this five to 10-minute time
19  period not only was she having toxic fumes, but she also
20  was being burned on her feet, and she was aware of what
21  was going on around her, at least to some extent, may
22  have tried to move things around, it's really difficult
23  to say, but basically being burned and -- is a painful
24  thing, and it was horrific and frightening, and
25  certainly the terror itself put her in harm's way, if
```

```
 1  you will.
 2      Q.    Is it your opinion that when this fire started
 3  she was awake --
 4      A.    Yes, --
 5      Q.    -- or sleeping?
 6      A.    -- she was awake.
 7      Q.    And is it your opinion she was in the same
 8  position she was in with which the pictures show after
 9  the fire?
10      A.    There's no way to know that.
11            She was in a fetal position, drawn up, but the
12  point is this is a lady who was dependent on her
13  caregiver for really mobility and ambulating to a large
14  extent.
15      Q.    Do you have an opinion whether she was lying
16  down or sitting down?
17            MS. ALEXANDER:  At the time the fire started?
18            THE WITNESS:  Started?
19            MR. COLEMAN:  Yes.
20            THE WITNESS:  I think she was probably lying
21  down, but I don't know that.
22  BY MR. COLEMAN:
23      Q.    And do you recall reading anything from
24  Ms. McCardle's deposition as to the position in which
25  Ida Post usually slept?
```

1  Q.    It may have been as low as six months?
2  A.    Not in my opinion.
3  Q.    Would you agree other medical professionals
4  could opine she had only six months left to live?
5        MS. ALEXANDER:  Objection.  Calls for
6  speculation.
7        THE WITNESS:  I have no idea what anyone else
8  is going to do.
9  BY MR. COLEMAN:
10 Q.    Do you have any additional opinions other than
11 the ones we've just discussed?
12 A.    Only --
13       Let me just sum up and -- that she died
14 prematurely in my opinion, in all reasonable medical
15 probability that a substantial cause of her death was, I
16 think, toxic gases, and the other substantial cause of
17 her death was the fire itself as far as burns, and that
18 had this fire not happened, again, she would have
19 survived and been part of her family and enjoyed the
20 remainder of her life.
21 Q.    In the past 20 years have you attended
22 autopsies?
23 A.    In the past 20 years --
24       That's a good question.
25       I think I have attended a couple of autopsies.

```
 1    Q.    When was the last one?
 2    A.    Probably close to 18, 19 years ago.
 3    Q.    Okay.  And what was the occasion?
 4    A.    I don't recall.
 5          One of my patients passed away, and I wanted
 6  to see why they died.
 7    Q.    And who performed the autopsy?
 8    A.    Again, I don't -- I think it was at USC, if
 9  I'm not mistaken.
10    Q.    Was it their pathology department?
11    A.    Yeah.
12    Q.    It was a pathologist that did it?
13    A.    Yeah.  Oh, yeah.
14    Q.    Okay.  Have you ever done an autopsy?
15    A.    Yes, I took part in autopsies when I was a
16  medical student.
17    Q.    Okay.  Outside of medical student?
18    A.    No.
19          I can't tie knots, I can't cut, and I don't do
20  sushi as far as preparing it.
21    Q.    Would you agree that based on the autopsy done
22  by Dr. Resk there was no evidence of any heat damage to
23  any of the tissues in her mouth?
24    A.    From what I can recall there was no soot in
25  her mouth.  She certainly had part of her face
```

1  A.  Well, I'll be very straight out.

2      I did emergency medicine before there was

3  emergency medicine, if you will.

4      I covered the emergency room at Johns Hopkins

5  as an intern resident and was actually in charge of the

6  medical emergency room as part of my training.

7      In addition to that, when I was at Harvard in

8  Massachusetts General Hospital, I did cover the urgent

9  care portion of the emergency room, and when I was at

10 SC, USC, up until, I would guess, five, six years ago,

11 we would go in to the emergency room and see new

12 patients as part of the admitting process, people who

13 were going to come in.

14     So I was in the emergency room probably four

15 or five times a week --

16 Q.  Okay.  And --

17 A.  -- seeing patients with my house staff.

18 Q.  -- after you completed your residency at Johns

19 Hopkins did you have any other experience?

20 A.  Well, that's what I was just telling you.

21     I was at Harvard after that and SC and I was

22 doing that until 2004.

23 Q.  Okay.  And did you have occasion to treat

24 badly burned people?

25 A.  No.  That would be done by our burn unit,

1  which -- is plastic surgery and surgeons who are
2  specialized in that area.
3      Q.   Okay.  So you haven't been involved in
4  treating badly burned --
5      A.   The only time was at Johns Hopkins when I
6  dealt in burns.
7      Q.   All right.  In your expert witness disclosure
8  you mentioned -- I mean, you gave forth a long list of
9  trial and deposition testimony.
10     A.   Where is this, sir?
11          MS. ALEXANDER:  Exhibit B.
12          THE WITNESS:  Oh.  Thank you.
13          Yeah.
14          Great.  Thanks.
15 BY MR. COLEMAN:
16     Q.   Okay.  Looking at page 1 --
17     A.   Okay.  That's page 1.
18          Yes, sir.
19     Q.   I'm going to start with some of the recent
20 things in California.
21          The Jarman, J-a-r-m-a-n, case?
22     A.   Yes.
23     Q.   Was that in Federal Court or State Court?
24     A.   Was State Court.
25     Q.   And where was that?