**EXHIBIT F**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

---oOo---

THOMAS POST, Individually and
as Personal Representative of
the Estate of Ida POST; DEBRA
FERGUSON; BOBBIE HASKETT;
MICHAEL POST; LAURA ZEDAKER;    No. 2:11-cv-00792-JAM-CMK
AND MARGIE ZERVOS,

       Plaintiffs,

  vs.

SUNBEAM PRODUCTS, INC.,

       Defendant.


DEPOSITION OF THOMAS K. RESK, M.D.

Wednesday, November 30, 2011

2:16 p.m.

Chico, California


Reported By:  GAIL BLANKENSHIP, CSR No. 3980

DUENSING DEPOSITION REPORTERS

A P P E A R A N C E S

For Plaintiff

    MARY ALEXANDER & ASSOCIATES, P.C.
    44 Montgomery Street, Suite 1303
    San Francisco, California 94104
    Telephone:  415.433.4440
    Email:  malexander@maryalexanderlaw.com
    BY:  MARY ALEXANDER, ESQ.
        (NO APPEARANCE)
        and
    BURG, SIMPSON, ELDREDGE, HERSH & JARDINE
    40 Inverness Drive East
    Englewood, Colorado 80112
    Telephone:  303.792.5595
    Email:  gmclaughlin@burgsimpson.com
    BY:  GEORGE E. McLAUGHLIN, ESQ.
        (Special Counsel)

For Defendants SUNBEAM PRODUCTS, INC.

    BOLLING & GAWTHROP
    Attorneys at Law
    8880 Cal Center Drive, Suite 190
    Sacramento, California 95826
    916.369.0777
    BY:  JOHN P. COLEMAN, ESQ.
        (No Appearance)

        and

    MOFFETT, VITU, LASCOE & PACKUS
    Attorneys at Law
    255 East Brown Street, Suite 340
    Birmingham, Michigan 48009
    Telephone:  248.646.5100
    Email:  tvitu@mdaal.com
    BY:  THOMAS L. VITU, ESQ.

CERTIFICATE OF REPORTER

I, GAIL BLANKENSHIP, Certified Shorthand Reporter of the State of California, do hereby certify:

That prior to being examined, the witness whose signature is affixed to the foregoing deposition, THOMAS K. RESK, M.D., unless signature is waived in accordance with stipulation, was placed under oath:

That said deposition was taken before me at the time and place set forth, and was taken down by me in shorthand and thereafter reduced to computerized transcription under my direction and supervision, and I hereby certify the foregoing deposition is a full, true and correct transcript of testimony given by the witness.

I further certify that I am not of counsel or attorney for any of the parties hereto, or in any way interested in the event of this cause, and that I am not related to any of the parties hereto.

WITNESS MY HAND this 21st day of December, 2011.

GAIL BLANKENSHIP, CSR
License No. 3980
State of California

75

1    Q.  And they were both available to assist you in
2  this case?
3    A.  Yes, sir.
4    Q.  Okay.  Let's look at some of the findings as
5  noted on your report, page two.  Looks like you
6  document your observation of external injuries, thermal
7  burns over approximately 75 percent of Ms. Post's body?
8    A.  Is that a question, sir?
9    Q.  Yes.
10   A.  That's correct.
11   Q.  You also note a finding of no evidence of
12 cherry red discoloration of the heart's blood or blood
13 noted within the skeletal muscular.  What's the
14 significance of that notation?
15   A.  In a conflagration where carbonaceous material
16 is produced, typically there will be carbon monoxide
17 which will be produced.  And carbon monoxide is an
18 odorless, colorless gas that is poisonous to human
19 beings and animals and causes a change in the color of
20 the blood to a bright -- with increasing amounts of
21 carbon monoxide in the blood, the blood becomes cherry
22 red in coloration.
23   The muscles, because they are suffused with a lot
24 of blood, will typically also reflect that cherry red
25 discoloration or cherry red coloration, which is

42

1  atypical for a body. You can otherwise see cherry red
2  discoloration in a body that has been cooled, not quite
3  frozen, but very cold. You sometimes see that.
4      Q. Did the blood also turn cherry red from the
5  inhalation of other gases that are released during
6  combustion, other than carbon monoxide?
7      A. Not to my knowledge, no, sir.
8      Q. What about cyanide? Would that turn blood
9  cherry red, if there was any inhalation of cyanide gas?
10     A. Not to my knowledge, no, sir.
11     Q. So based on your experience, that cherry red
12  would be a finding, if there was inhalation of carbon
13  monoxide?
14     A. Correct.
15     Q. And there was no cherry red discoloration in
16  this case indicative of any inhalation of carbon
17  monoxide?
18     A. That's correct.
19     Q. Last sentence on page two indicates,
20  examination of the trachea and mouth shows no evidence
21  of soot deposition. Why did you note that finding?
22     A. It's a significant finding, in the absence of
23  soot, when a fire breaks out, when a conflagration
24  breaks out, there is a great deal of soot in
25  carbonaceous material that is burned forming soot. And

43

DUENSING DEPOSITION REPORTERS

1  as a person breathes, they will breathe that soot into
2  their lungs. So, consequently, soot will be deposited
3  on the lining of the nose, within the mouth, and also
4  on the trachea.
5      And the absence of that, or the presence of that,
6  supports the fact that the individual was within the
7  conflagration and, in fact, breathed in for a period of
8  time. The absence of that, while it doesn't rule out
9  that the person was in the conflagration, they did not
10 breathe in sufficient amounts of soot, assuming that
11 soot was present before they died.
12     Q. So you would have checked the trachea for any
13 soot deposition?
14     A. I did check the trachea, sir.
15     Q. And you checked the mouth?
16     A. Yes, sir.
17     Q. And you checked the nasal airways?
18     A. I did, yes, sir.
19     Q. And found no evidence of breathing or inhaling
20 any products of combustion generated by this fire?
21     A. That's correct, yes, sir.
22     Q. If this woman was breathing at the time of the
23 fire, would you expect soot deposition in her mouth,
24 nose or trachea?
25     A. If she were breathing, as I testified to just

44

1 a moment ago, if she was breathing for a significant
2 period of time, then I would expect that.
3     Q. I imagine that you've done autopsies on other
4 bodies of people that have died in fires?
5     A. Yes, sir.
6     Q. Okay. And are you aware that often super hot
7 gases are released in the area at the time of the fire?
8     A. Super hot gases can be released, for example,
9 in a flashover situation. It depends on the
10 circumstances of the fire, which I was not
11 knowledgeable about.
12     Q. Okay. Did you check for any evidence of burn
13 injury from inhalation of hot gases at the time of the
14 fire?
15     A. I looked with naked eye examination, gross
16 examination, I looked at the tissue, specifically the
17 trachea, the mouth, the tongue, looking for any
18 evidence of any burns or any desiccation, drying,
19 excessive drying or corrosion of the lining of these
20 organs, and found none. Similarly, in the stomach, I
21 found no evidence of soot either --
22     Q. Did you find --
23     A. -- or in the esophagus.
24     Q. Did you find any evidence that this woman was
25 still breathing at the time of the fire?

1    A.  I found no evidence that she was -- if she
2 were breathing, she would have been breathing during
3 the initial part of the fire, prior to the generation
4 of significant amounts of soot.
5    Q.  And I think you qualified that, if she was
6 breathing at the time of the fire?
7    A.  That's correct, yes, sir.
8    Q.  Okay.  Certainly by the time this fire got to
9 the extent that it did, she was not breathing?  You
10 could fairly conclude that?
11    A.  Well, at some point she died, clearly.  And it
12 was my opinion -- it is my opinion that she died during
13 the course of the fire, during the early course of the
14 fire.
15    Q.  Go on to page three, please, of your report.
16 You note that there was no evidence of internal injury.
17 What were you looking for there?
18    A.  Looking for evidence of basically doing a
19 thorough examination as an independent, unbiased
20 observer with experience in anatomy.  Looking for
21 evidence of any possible injury, such as concealed
22 injuries.  Everything from bullet wounds, to stab
23 wounds, to fractures or other features that might be
24 present that would preclude the presumption that this
25 was an accidental conflagration that occurred, rather

46

DUENSING DEPOSITION REPORTERS

that would explain one reason for the absence of carbon monoxide in her system, as well as identified at autopsy.

Another possibility would be the possibility of an electrical injury, such as a low voltage electrocution that could have induced an electrical rhythm disturbance in her heart that would have led to a process called ventricular fibrillation, where the heart beats ineffectively.

Q. Okay. But there's nothing to indicate that's what happened in this case?

A. I found no evidence at autopsy to support that.

Q. Did you find any evidence that this woman was conscious at the time of the fire?

A. No, sir. Other than the fact of her position on the -- on the sofa and the, or on the couch, where she assumed a fetal -- where she's assumed a fetal position.

Q. Okay. Did you hear any information that that's the position she would assume when she would be sleeping on the couch?

A. I don't specifically recall.

Q. Are you able to rule out that this woman was deceased before the fire?

56

1   A.  In my opinion, she was not deceased before the
2   fire.
3   Q.  And what do you base that on?
4   A.  I base that on the circumstances of the
5   discovery of the decedent and the lack of significant
6   heart disease in her, including really antecedent
7   evidence of heart disease.  She certainly had other
8   significant disease, lung disease, for years, had had a
9   previous stroke.  But the heart disease was relatively
10  bland.  Quite possibly, one could hypothesize many
11  different scenarios, but it's possible that a fire
12  could have erupted and she could have been -- suffered
13  a coronary artery spasm, leading to rhythm disturbance
14  and ultimately death.  But the basic, but for the fire,
15  she would not have succumbed.
16  Q.  Okay.  So if I'm understanding you correctly,
17  you believe that she was not deceased before the fire;
18  is that correct?
19  A.  That's what I just testified to, yes, sir.
20  Q.  It's your opinion that she died very early on
21  in the process of the fire.
22  A.  That's correct, yes, sir.
23  Q.  And there is no evidence that she was
24  conscious at the time of the fire?
25  A.  I have no evidence to support that.

57

1  Q. Continuing on page three, internal examination, you note that the tracheobronchial tree was unremarkable. There was no evidence of aspiration. Do you see those findings?

5  A. I do, yes, sir.

6  Q. And, again, was there any evidence of inhalation and burning within the tracheobronchial tree?

9  A. There was none.

10  Q. What did your examination of the heart show?

11  A. Examination of the heart showed, for a woman of this age, with a relatively healthy heart, with about 50 percent coronary artery obstruction, due to arteriosclerotic coronary artery disease, which, while it is definitely atherosclerotic heart disease, is not necessarily of a grave nature that is associated with imminent death. Can be, but it's not what we typically see in a person that drops over dead.

19  Q. She had some atherosclerotic artery disease but not enough to compromise her heart function. Is that what you concluded?

22  A. That's my conclusion, yes.

23  Q. If this woman had a heart attack just before or during the fire, would that have been a finding that you would have been able to detect?

50

1  A. No.
2  Q. So there is no evidence of drug abuse,
3  correct?
4  A. No.
5  Q. Not even any evidence that she had been taking
6  sedatives, correct?
7  A. Correct.
8  Q. Part of the toxicology screen looked for
9  carbon monoxide, didn't it?
10  A. Yes.
11  Q. Did you find any evidence of carbon monoxide
12  poisoning?
13  A. No, sir.
14  Q. Would that also indicate that Mrs. Post was
15  not alive and breathing air that was being consumed by
16  a slow developing fire?
17  A. That's correct.
18  Q. Did you find any evidence that Mrs. Post had
19  inhaled what some called super hot toxic gases?
20  A. I did not.
21  Q. You understand that Mrs. Post was of limited
22  mobility?
23  A. That's right.
24  Q. May not have been able to have stood up and
25  run out of the home?