**EXHIBIT C**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

---oOo---

THOMAS POST, Individually and
as Personal Representative of
the Estate of Ida POST; DEBRA
FERGUSON; BOBBIE HASKETT;
MICHAEL POST; LAURA ZEDAKER;     No. 2:11-cv-00792-JAM-CMK
AND MARGIE ZERVOS,

       Plaintiffs,

  vs.

SUNBEAM PRODUCTS, INC.,

       Defendant.


DEPOSITION OF THOMAS K. RESK, M.D.

Wednesday, November 30, 2011

2:16 p.m.

Chico, California


Reported By:  GAIL BLANKENSHIP, CSR No. 3980

```
 1                  A P P E A R A N C E S

 2   For Plaintiff

 3           MARY ALEXANDER & ASSOCIATES, P.C.
             44 Montgomery Street, Suite 1303
 4           San Francisco, California 94104
             Telephone:  415.433.4440
 5           Email:  malexander@maryalexanderlaw.com
             BY:  MARY ALEXANDER, ESQ.
 6                (NO APPEARANCE)
                          and
 7           BURG, SIMPSON, ELDREDGE, HERSH & JARDINE
             40 Inverness Drive East
 8           Englewood, Colorado 80112
             Telephone:  303.792.5595
 9           Email:  gmclaughlin@burgsimpson.com
             BY:  GEORGE E. McLAUGHLIN, ESQ.
10                (Special Counsel)

11   For Defendants SUNBEAM PRODUCTS, INC.

12           BOLLING & GAWTHROP
             Attorneys at Law
13           8880 Cal Center Drive, Suite 190
             Sacramento, California 95826
14           916.369.0777
             BY:  JOHN P. COLEMAN, ESQ.
15                (No Appearance)

16                        and

17           MOFFETT, VITU, LASCOE & PACKUS
             Attorneys at Law
18           255 East Brown Street, Suite 340
             Birmingham, Michigan 48009
19           Telephone:  248.646.5100
             Email:  tvitu@mdaal.com
20           BY:  THOMAS L. VITU, ESQ.

21

22

23

24

25
                              2
```

CERTIFICATE OF REPORTER

I, GAIL BLANKENSHIP, Certified Shorthand Reporter of the State of California, do hereby certify:

That prior to being examined, the witness whose signature is affixed to the foregoing deposition, THOMAS K. RESK, M.D., unless signature is waived in accordance with stipulation, was placed under oath:

That said deposition was taken before me at the time and place set forth, and was taken down by me in shorthand and thereafter reduced to computerized transcription under my direction and supervision, and I hereby certify the foregoing deposition is a full, true and correct transcript of testimony given by the witness.

I further certify that I am not of counsel or attorney for any of the parties hereto, or in any way interested in the event of this cause, and that I am not related to any of the parties hereto.

WITNESS MY HAND this 21st day of December, 2011.

GAIL BLANKENSHIP, CSR
License No. 3980
State of California

75

1  a moment ago, if she was breathing for a significant
2  period of time, then I would expect that.
3      Q.  I imagine that you've done autopsies on other
4  bodies of people that have died in fires?
5      A.  Yes, sir.
6      Q.  Okay.  And are you aware that often super hot
7  gases are released in the area at the time of the fire?
8      A.  Super hot gases can be released, for example,
9  in a flashover situation.  It depends on the
10 circumstances of the fire, which I was not
11 knowledgeable about.
12     Q.  Okay.  Did you check for any evidence of burn
13 injury from inhalation of hot gases at the time of the
14 fire?
15     A.  I looked with naked eye examination, gross
16 examination, I looked at the tissue, specifically the
17 trachea, the mouth, the tongue, looking for any
18 evidence of any burns or any desiccation, drying,
19 excessive drying or corrosion of the lining of these
20 organs, and found none.  Similarly, in the stomach, I
21 found no evidence of soot either --
22     Q.  Did you find --
23     A.  -- or in the esophagus.
24     Q.  Did you find any evidence that this woman was
25 still breathing at the time of the fire?

45

DUENSING DEPOSITION REPORTERS

1  A.  I found no evidence that she was -- if she
2  were breathing, she would have been breathing during
3  the initial part of the fire, prior to the generation
4  of significant amounts of soot.
5  Q.  And I think you qualified that, if she was
6  breathing at the time of the fire?
7  A.  That's correct, yes, sir.
8  Q.  Okay.  Certainly by the time this fire got to
9  the extent that it did, she was not breathing?  You
10 could fairly conclude that?
11 A.  Well, at some point she died, clearly.  And it
12 was my opinion -- it is my opinion that she died during
13 the course of the fire, during the early course of the
14 fire.
15 Q.  Go on to page three, please, of your report.
16 You note that there was no evidence of internal injury.
17 What were you looking for there?
18 A.  Looking for evidence of basically doing a
19 thorough examination as an independent, unbiased
20 observer with experience in anatomy.  Looking for
21 evidence of any possible injury, such as concealed
22 injuries.  Everything from bullet wounds, to stab
23 wounds, to fractures or other features that might be
24 present that would preclude the presumption that this
25 was an accidental conflagration that occurred, rather

46

1        A.   In my opinion, she was not deceased before the
2   fire.
3        Q.   And what do you base that on?
4        A.   I base that on the circumstances of the
5   discovery of the decedent and the lack of significant
6   heart disease in her, including really antecedent
7   evidence of heart disease.  She certainly had other
8   significant disease, lung disease, for years, had had a
9   previous stroke.  But the heart disease was relatively
10  bland.  Quite possibly, one could hypothesize many
11  different scenarios, but it's possible that a fire
12  could have erupted and she could have been -- suffered
13  a coronary artery spasm, leading to rhythm disturbance
14  and ultimately death.  But the basic, but for the fire,
15  she would not have succumbed.
16       Q.   Okay.  So if I'm understanding you correctly,
17  you believe that she was not deceased before the fire;
18  is that correct?
19       A.   That's what I just testified to, yes, sir.
20       Q.   It's your opinion that she died very early on
21  in the process of the fire.
22       A.   That's correct, yes, sir.
23       Q.   And there is no evidence that she was
24  conscious at the time of the fire?
25       A.   I have no evidence to support that.

```
 1       Q.  Based upon what you reviewed in the medical
 2  records, and looking at all the conditions that this
 3  woman had, do you have any opinion about her life
 4  expectancy, had the fire not occurred?
 5       A.  I'm not in the prophecy business.
 6       Q.  How would you describe her general overall
 7  physical health condition just before the fire?
 8       A.  She had severe chronic obstructive pulmonary
 9  disease.  She was an inveterate smoker, that in the
10  medical records becomes clear that she's probably lying
11  to her doctors, in terms of the extent of her continued
12  smoking.  And she continued smoking, despite being on
13  oxygen.  Virtually almost a full-time basis,
14  apparently, from what I could read.  She had several
15  bouts with respiratory failure, in addition to other
16  issues.  She had difficulty in walking around.  She
17  also had a significant hypertension and had had --
18  already had an old stroke from about three, perhaps
19  four years, I think it was 2005.  But several years
20  prior to her death, she had had a cerebral vascular
21  accident or stroke, which left her with some residual
22  weakness, characterized in the medical records as right
23  hemiparesis.
24       But to respond to your question, she was not in
25  very good shape, and I would suspect her life
```

1  expectancy would not be that great because of her
2  noncompliance, apparent noncompliance with the medical
3  regimen, as outlined by her medical care providers and
4  her continued smoking.
5      MR. McLAUGHLIN: I'm going to make a motion to
6  strike the nonresponsive portion of that answer,
7  specifically references to smoking. Also asserting an
8  objection on the lack of foundation, adequate
9  foundation, to give an opinion on life expectancy.
10     MR. VITU: Q. Looking at this e-mail quickly
11 that we've previously identified as Exhibit 9, there is
12 a designation in here that RP --
13     A. RP stands for, in capital letters, RP is a law
14 enforcement term, which stands for the reporting party,
15 whoever it was that was giving the interview that
16 either found the individual, found the decedent, or was
17 giving information to the officer, the deputy taking
18 the report.
19     Q. Okay. And this e-mail indicates that RP said
20 she would not have been able to get out of the
21 residence by herself, but she would have been able to
22 crawl or at least throw off an electric blanket that
23 was malfunctioning IMO? What is IMO?
24     A. Let me -- I'll read the pertinent sentence
25 from this e-mail that I generated and sent to my Chief